# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### ASSIGNED ON BRIEFS MAY 7, 2009

## STATE OF TENNESSEE, DEPARTMENT OF CHILDREN'S SERVICES v. TINA TEMPLE, ET AL.

### IN RE: B.T., d.o.b 03/02/1993
### J.R.T., d.o.b. 08/04/1995
### J.L.T., d.o.b. 04/29/1997
### J.B.T., d.o.b. 12/23/1998
### J.A.T., d.o.b. 03/01/2003

### Children Under 18 Years of Age

**Direct Appeal from the Juvenile Court for Shelby County**
**No. R3018     Herbert J. Lane, Special Judge**

_____

**No. W2008-02803-COA-R3-PT - Filed November 5, 2009**

_____

This a termination of parental rights case. The children were removed from Father's custody due to his lack of stable housing as well as his allowing Mother to "be with" the children despite her drug use. Numerous permanency plans were entered, which required Father, among other things, to maintain stable housing and income, legitimate the children, complete parenting classes, identify a support system, and attend family and domestic violence counseling. At various times, Father had employment and housing; however, at other times, he did not. In 2008, DCS petitioned to terminate Father's parental rights. Following a trial, Father's parental rights were terminated on the grounds of failure to comply with the requirements of the permanency plans, persistence of conditions, as well as three additional grounds available under Tennessee Code Annotated section 36-1-113(g)(9) for the termination of a non-legal parent's rights. Although this Court finds that Father failed to obtain and maintain stable housing and income or to legitimate the children, we reverse the termination of Father's parental rights, finding that DCS failed to aid Father in such efforts. The judgment of the trial court is reversed, the petition for termination is dismissed, and the cause is remanded for further proceedings consistent with this opinion.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Juvenile Court Reversed; Petition Dismissed; Cases Remanded for Further Proceedings**

ALAN E. HIGHERS, P.J.,W.S., delivered the opinion of the court, in which DAVID R. FARMER, J., joined and HOLLY M. KIRBY, J., dissented.

Ada Johnson, Memphis, TN, for Appellant Junior Davis

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General, Lindsey O. Appiah, Assistant Attorney General, Nashville, TN, for Appellee

**OPINION**

## I. FACTS & PROCEDURAL HISTORY

Junior Davis ("Father") filed a "Petition" in the Juvenile Court of Memphis, Tennessee, on November 8, 2004, alleging that his children, B.T., J.R.T., J.L.T., J.B.T., and J.A.T., currently in the custody of their mother, Tina Temple ("Mother"), were dependent and neglected.[1] Specifically, Father alleged that Mother was "a substance abuser addicted to crack cocaine[,]" that he had witnessed a man pull a gun on Mother demanding money, that Mother's home had no heating or air conditioning, that the children went "to school dirty and unkempt[,]" and that J.R.T. and J.L.T. were currently suspended from school for truancy. A State of Tennessee, Department of Children's Services ("DCS") employee visited Mother's home and allegedly "found mold growing throughout the house and no food." The DCS employee also met with the children at school, who reportedly told her that "they had seen their mother smoke crack." Following a hearing, Father was granted temporary custody of the children on November 10, 2004.

On November 18, 2004, DCS filed an "Intervening Petition to Adjudicate Dependency and Neglect," stating that it had discovered that Father was unemployed and homeless. That same day, the juvenile court granted DCS temporary custody of the children. However, temporary custody was, again, returned to Father on December 17, 2004, pending further orders of the trial court. B.T., the oldest child, was returned to DCS custody on February 18, 2005, due to his need for ongoing supervised medical care as a result of an untreated sinus infection spreading to his brain, necessitating brain surgery and hospitalization.

On May 6, 2005, the children were adjudicated to be dependent and neglected, and were returned to DCS custody. Specifically, the trial court noted that the children had been living with Father since December 17, 2004, and that since February 18, 2005, the children had been enrolled in three different schools. The trial court also stated that Father had "moved frequently[,]" had "no stable housing[,]" and had allowed Mother "to be with the children" despite her drug use. The trial court also noted that

---

[1] Paternity testing performed in early 2008 revealed that Father was not the biological father of J.A.T. or B.T. However, Father was identified, with a 99.999% probability, as the biological father of J.L.T., J.R.T., and J.B.T.

[t]he case manager from Memphis and Shelby County Community Services Agency made several visits to the home and the school and spoke with the father about a plan to furnish the family with furniture, bedding, clothing and daycare. However, the father moved three times since February 18, 2005, before services could be rendered.

DCS entered into numerous permanency plans with Father, on various dates, which required the following of him: visiting the children on a regular basis; ensuring the children attended school on a regular basis; maintaining stable housing and income; completing a mental health evaluation and following the recommendations thereof; completing parenting classes and providing a certificate thereof, and exhibiting skills learned; legitimating the children; completing domestic violence classes and providing a certificate thereof; accepting help from a parent aide; showing capability to financially support the children; attending family counseling sessions and following recommendations thereof; identifying a support system; notifying the Department of any financial problems or needs in furnishing a home; and meeting and maintaining B.T.'s medical needs.[2]  The stated goal of the initial permanency plans,[3] entered on May 23, 2005, was to "Reunify with Parent(s)."  This goal was modified to "Reunify with Parent(s)/Adoption" on January 16, 2008.  The stated reason for the goal change was that the children have "been in [DCS] care since 5/6/05, [DCS] has been solely working with the parent[]s and their conditions still exist."

A permanency plan review was held on March 18, 2008, before the juvenile court referee. The referee found the parties in non-compliance with the permanency plans, and ordered the matter reset for July 15, 2008, at which point if the parties continued to be non-compliant with the requirements of the permanency plan, the sole goal would be changed to "adoption."  On May 30, 2008, DCS filed a "Petition for Termination of Parental Rights," seeking to terminate Father's parental rights to the children on the grounds of failure to comply with the requirements of the permanency plans, failure to remedy the persistent conditions which led to the removal of the children, failure to establish parentage, and based on the best interests of the children.[4]

A hearing was held on July 15, 2008, at which the referee revised the permanency plan goal to "adoption," citing the parents' noncompliance with the permanency plans.  Specifically, the referee found that Father had failed to set up a support system or obtain stable housing, despite DCS's reasonable efforts in providing services to the parties.

---

[2] In its "Order Terminating Parental Rights and Final Decree of Partial Guardianship," the trial court stated that pursuant to the permanency plans, Father was required to complete anger management classes, and the trial judge stated from the bench that Father had completed anger management.  We find no evidence in the numerous permanency plans that Father was required to attend anger management; therefore, we will not consider this requirement in determining whether Father complied with the permanency plans.

[3] Separate permanency plans were entered for each child.

[4] The "Petition for Termination of Parental Rights" also sought to terminate the parental rights of Mother; Michael Price, the alleged father of B.T.; Emmanuel Green, the alleged father of J.A.T.; and Unknown Father(s) to the children.  The "Petition for Termination of Parental Rights" alleged Father's incompetence as an additional ground for termination; however, this ground was struck by the trial court.

Trial on the termination of Father's parental rights was held on October 21, 2008. At trial, Janet Jones, a DCS family service worker who was assigned to the children's case in October of 2007, testified that Father had not attempted to legitimate the children and had failed to maintain consistent and stable housing or employment as required by the permanency plans. Specifically, she testified that since she began working on the case, Father had "been unstable as far as housing . . . and he's been back and forth as far as jobs - - he's been from job to job[.]" She further stated that although he reports that he "has found a home" he would not provide Ms. Jones with the home's address in order that a home study could be performed. Finally, she testified that Father had secured no support system, and had not been attending family counseling, as required by the permanency plans.

Father also testified at trial. He testified that he informed Ms. Jones of his recent purchase of a four-bedroom home. However, he explained that he was currently living with his mother, because his new home needed repairs, as some of his home's pipes had been stolen and he needed to "get the [interior] walls back up." Father was unable to state when he anticipated moving into his new residence. He also testified that he was currently employed at Crother, a laundry service, but was unable to provide a check stub beyond August 2008. He further claimed that he had a support group, that he had attempted to legitimate the children, and that DCS had provided him with no services. Finally, Father acknowledged that he was not presently able to financially support the children or to provide them with a stable residence. When asked of his plan to raise the children if they were returned to his care, Father stated "Well, I guess I'll do the best of whatever I got."

A court order filed on October 31, 2008, terminated Father's parental rights.[5] The trial court found by clear and convincing evidence that Father had "failed to complete the most important tasks [required by the permanency plans, despite DCS'] Herculean efforts[,]" that the conditions which led to the children's removal still persisted and that there was little likelihood that these conditions would be soon-remedied, that Father had failed to legitimate the children, and that termination was in the children's best interest. Father appeals from this order.

## II. ISSUES PRESENTED

Father has timely filed his notice of appeal and presents the following issues for review:

1.  Whether clear and convincing evidence supports the trial court's decision to terminate Mr. Davis' parental rights on any of the several statutory grounds;

2.  Whether the termination of Mr. Davis' parental rights should be reversed because DCS did not exert reasonable efforts;

---

[5] The parental rights of Mother, Michael Price, Emmanuel Green, and Unknown Father(s) were also terminated, but are not subject to this appeal.

3.      Whether clear and convincing evidence supports the trial court's determination that termination of Mr. Davis' parental rights was in the children's best interest; and

4.      Whether the termination of Mr. Davis' parental rights should be reversed because the juvenile court referee Herbert Lane did not have the authority to sit as special judge for the said termination hearing.

We reverse the decision of the trial court, finding that DCS failed to exert reasonable efforts regarding grounds 36-1-113(g)(2) and (3), or to assist Father regarding grounds 36-1-113(g)(9)(iv), (v), and (vi).

### III.   STANDARD OF REVIEW

"A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re J.C.D.*, 254 S.W.3d 432, 437 (Tenn. Ct. App. 2007); *In re Audrey S.*, 182 S.W.3d 838, 860 (Tenn. Ct. App. 2005). Although the parent's right is fundamental and superior to the claims of other persons and the government, it is not absolute. *Id.* A parent's right "continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination." *Id.*; *see also In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

In Tennessee, proceedings to terminate a parent's parental rights are governed by statute. *In re J.C.D.*, 254 S.W.3d at 438; *In re Audrey S.*, 182 S.W.3d at 860. A court may not terminate a parent's rights to his or her children unless there is specific statutory authority to do so. *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004). "Parties who have standing to seek the termination of a biological parent's parental rights must prove two things." *In re Audrey S.*, 182 S.W.3d at 860; *see also In re M.J.B.*, 140 S.W.3d at 653. First, they must prove the existence of at least one of the statutory grounds for termination, which are listed in Tennessee Code Annotated section 36-1-113(g). *Id.* Second, they must prove that terminating parental rights is in the child's best interest, considering, among other things, the factors listed in Tennessee Code Annotated section 36-1-113(I). *Id.* Because no civil action carries graver consequences than a petition to sever family ties forever, a person seeking to terminate parental rights must prove both of the elements for termination by clear and convincing evidence. *Id.* at 860-61. In sum, "[t]o terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006) (citing *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). Clear and convincing evidence has been defined as evidence that "eliminates any serious or substantial doubt concerning the correctness of the conclusion to be drawn from the evidence." *In re L.J.C.*, 124 S.W.3d 609, 619 (Tenn. Ct. App. 2003) (quoting *In the Matter of: C.D.B., S.S.B., & S.E.B.*, 37 S.W.3d 925, 927 (Tenn. Ct. App. 2000)). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Audrey S.*, 182 S.W.3d at 861.

Because of the heightened burden of proof in parental termination cases, on appeal, we must adapt our customary standard of review as set forth in Tennessee Rule of Appellate Procedure 13(d). *In re Audrey S.*, 182 S.W.3d at 861. First, we review each of the trial court's specific factual findings de novo in accordance with Rule 13(d), presuming the finding to be correct unless the evidence preponderates against it. *Id.* Second, we must determine whether the facts (either as found by the trial court or as supported by the preponderance of the evidence) clearly and convincingly establish the elements required to terminate parental rights. *Id.*

## IV. DISCUSSION

### 1. *Authority of Special Judge Lane*

On appeal, Father argues that the termination of his parental rights should be reversed because Special Judge Lane did not have authority to preside over the termination. This Court recently addressed this same issue involving Special Judge Lane in *In re M.A.P.*, No. W2008-01352-COA-R3-PT, 2009 WL 2003357, at *13 n.11 (Tenn. Ct. App. July 10, 2009). We explained that "[t]he Tennessee Supreme Court has discussed at length the proper procedures to be followed when appointing a special judge under these statutes, and has emphasized the requirement that a judge's absence be 'necessary' to warrant the appointment." *Id.* (citing *Ferrell v. Cigna Prop. & Cas. Ins. Co.*, 33 S.W.3d 731, 737-38 (Tenn. 2000)). However, we also explained that "even if the proper procedures are not followed under the statute, the special judge's decision will be binding on the parties if he is acting as a de facto judge, *i.e.*, in good faith under color of right." *Id.* (citing *Ferrell*, 33 S.W.3d at 739; *Tenn. Dep't Human Servs. v. A.M.H. (In re A.B.)*, 198 S.W.3d 757, 764 (Tenn. Ct. App. 2006)). We concluded that "regardless of whether the proper procedures were followed in appointing Special Judge Lane to preside over the case, he was appointed under color of law, and there is nothing in the record indicating that he acted in bad faith." *Id.* Therefore, we held that Special Judge Lane acted as a de facto judge and considered the merits of the appeal. We will follow the Court's decision in *In re M.A.P.* and proceed to address the issues presented on appeal.

### 2. *Non-Compliance with the Permanency Plans*

Tennessee Code Annotated section 36-1-113(g)(2) provides that parental rights may be terminated when "[t]here has been substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan[.]"

As we stated above, numerous permanency plans were entered in this case, which required the following of Father: visiting the children on a regular basis; ensuring the children attended school on a regular basis; maintaining stable housing and income; completing a mental health evaluation and following the recommendations thereof; completing parenting classes and providing a certificate thereof, and exhibiting skills learned; legitimating the children; completing domestic violence classes and providing a certificate thereof; accepting help from a parent aide; showing capability to

financially support the children; attending family counseling sessions and following recommendations thereof; identifying a support system; notifying the Department of any financial problems or needs in furnishing a home; and meeting and maintaining B.T.'s medical needs. In its "Order Terminating Parental Rights and Final Decree of Partial Guardianship," the trial court found by clear and convincing evidence that Father "completed some of the tasks of the permanency plans, yet failed to complete the most important tasks though [DCS] provided Herculean efforts to assist [him.]" Specifically, the trial court found that Father

> visited the children regularly and completed a mental health evaluation, parenting classes and anger management classes. However, he failed to maintain stable housing and income; he did not follow the recommendation of the mental health evaluation (which recommended that he maintain stable housing and employment for a year); he did not legitimate the children; he did not show he is capable of financially supporting the children; he did not notify [DCS] of financial problems or needs in furnishing a home; and he did not identify a support system.

On appeal, Father contests the reasonableness of the requirements placed on him pursuant to the permanency plans. He contends that "[t]he longer the children stayed in custody the more the department added to his parenting requirements, which hindered the children ever returning home." He further argues that "[a] few of these requirements were not reasonable and related to remedying the conditions, which necessitated foster care placement."

When parental rights are terminated based on non-compliance with a permanency plan, the court must find that the requirements of the permanency plan were "reasonable and related to remedying the conditions which necessitate foster care placement." *In re R.L.F.*, 278 S.W.3d at 312 (citing *In re Valentine*, 79 S.W.3d 539, 547 (Tenn. 2002)). Because Father fails to specify which requirements he found unreasonable, we will consider the reasonableness of each requirement. The children were adjudicated dependent and neglected on May 6, 2005, due to Father's reported homelessness and the children's truancy. Accordingly, the permanency plans required Father to maintain stable housing and employment, to show he was financially capable of supporting the children, and to ensure that the children attended school regularly. The children had been in state custody since 2005; therefore, in order to establish and maintain a necessary bond between Father and the children, the permanency plans required Father to visit the children regularly, and to conduct himself properly, demonstrating appropriate parenting skills. Given the family's exposure to parental drug abuse by Mother and interruptions in parental custody, the permanency plans required Father to engage in family counseling, parenting classes, and a mental health evaluation. Finally, considering Father's history of domestic violence charges,[6] B.T's medical history, the children's need for a legal father, and the difficulty of raising five children, Father was required to complete domestic violence classes, meet and maintain B.T.'s medical needs, legitimate the children, and

---

[6] According to the Center for Children and Parents, Le Bonheur Children's Medical Center Comprehensive Psycho-social Assessment of B.T., Father's arrest record includes three domestic violence charges.

identify a support system. We affirm the trial court's finding that these requirements were reasonable and related to the reasons necessitating foster care.

Having found the requirements "reasonable and related," we now turn to the question of whether Father was in substantial non-compliance with such requirements. The issue of substantial non-compliance is a question of law; thus, our review is de novo without a presumption of correctness. *In re R.L.F.*, 278 S.W.3d at 312 (citing *In re Valentine*, 79 S.W.3d at 546). To justify termination, non-compliance with a permanency plan must be "substantial," and mere technical non-compliance is insufficient to terminate parental rights. *Id.* (citing *In re S.H.*, No. M2007–01718-COA-R3-PT, 2008 WL 1901118, at *7 (Tenn. Ct. App. Apr. 30, 2008)). The degree of parental non-compliance with reasonable and related requirements must be assessed. *Id.* (citing *In re S.H.*, 2008 WL 1901118, at *7).

On appeal, Father insists that he "did all the Department required of him." He alleges that he "had a residence from 2005-2007, and he maintained employ[ment]; however, he changed jobs for better pay." He further states that "[o]n the date of the [termination] hearing[,] [he] testified that he had employment and a place to live." Father contends that because DCS failed to provide evidence to the contrary, that the trial court erred in finding he had failed to substantially comply with the permanency plans.

A review of the numerous "Findings and Recommendations of Referee" reveals that Father vacillated between compliance and non-compliance with the requirements of the permanency plans. The May 2005 findings, which ordered the children returned to DCS custody, found that Father had moved frequently with the children, had allowed the children to "be with" the Mother despite her drug use, and that Father had no stable housing. However, in October 2005, Father was in compliance with the permanency plans. Father had maintained stable housing and had agreed to undergo a mental health assessment. He had not, however, maintained stable income, and had missed his previous two appointments with DCS without explanation. Father was found compliant in both January and August of 2006 by completing parenting classes and a mental health assessment, as well as by securing income. The January findings reveal that Father had housing, but no mention is made either way in the August findings. Father was again found non-compliant in November of 2006, as he failed to visit the children regularly. By July of the following year, Father was compliant–participating in family counseling, and visiting and calling the children regularly. Father was non-compliant, though, by November of 2007, having failed to legitimate the children, to obtain stable housing or employment, or to begin domestic violence counseling. Father was non-compliant in both March and July of 2008. In March, the referee's findings indicate that Father "ha[d] not been attending family counseling sessions, ha[d] not provided proof of stable income, ha[d] not demonstrated parenting skills[, and] ha[d] not identified a support system."[7] Furthermore, the findings stated that Father was currently living with his mother "who does not want the children in

---

[7] At trial, Father testified that his support group included Everette Rickman and Reverend Moore. However, Ms. Jones testified that "We had one situation in court where [Father] did bring some people to court stating that they were his support group, but [she] tried to contact them afterwards but was not able to."

her home." The July 2008 findings stated that Father "ha[d] not progressed in his family sessions, he ha[d] not set up a support system, and he [did] not have stable housing."

The record clearly and convincingly supports the trial court's finding that Father failed to substantially comply with the requirements of the numerous permanency plans. While it is true that Father, at times, secured housing or employment, he was unable to maintain such for extended periods of time. The record does not support Father's contention that he maintained *stable* employment and income from 2005 to 2007. The "Findings and Recommendations" of the referee clearly show that Father did not have stable income in October of 2005, nor did he have stable housing or employment in November of 2007. Furthermore, at times between October of 2005 and November of 2007, when Father claims he had stable income and employment, he failed to substantially comply with other requirements of the permanency plans, namely that he visit the children regularly, that he legitimate the children, and that he attend domestic violence counseling.

The October 21, 2008 trial testimony further evidences Father's failure to secure and maintain stable housing and income. At trial, Ms. Jones testified that Father "has been unstable as far as housing since I've been working the case since October of 2007, and he's been back and forth as far as jobs - - he's been from job to job since I've been working on the case[.]" She also stated, "Since I've been working with [Father], he has, at times, been unemployed, but he's obtained employment, but as far as his being able to financially support the children, he had problems with that." When asked if Father was "better off" at the time of trial than at the time the children first entered DCS custody, she answered he's "[s]till the same."

Father claimed, at trial, that he had purchased a four-bedroom home two months prior to trial, but that he had "to get the piping done and the [interior] walls back up" before he and the children could move into it. According to Ms. Jones, though, Father refused to provide his new home's address in order that a home study could be performed. Additionally, he acknowledged that as of the trial date he had been living with his mother for one year,[8] that his mother would not allow the children to live in her home, and that he was unable to support the children financially or to provide them with a stable residence. Father did state that he was currently employed at Crother, a laundry service,[9] but according to Ms. Jones, Father had not provided a pay stub since August of 2008. When asked about his plan to get himself into a position where he could provide for his children financially, Father said "I plan [] on going back to college and all. I'm going to be a lawyer." When questioned regarding his plan to raise the children if they were returned to him, Father stated "Well, I guess I'll do the best of whatever I got."

---

[8]Ms. Jones testified at trial that she was told by Ms. Brooks of "U.T. Parenting," that Father had been living with his mother for over twenty years.

[9] Father testified that he has a twelfth grade education, and he classified his employment skills as "dishwashing, cleaning up or cutting grass or something similar to that."

Based on the foregoing, we find by clear and convincing evidence that Father failed to substantially comply with the requirements of the permanency plans.

### 3. *Persistence of Conditions*

As an additional ground for terminating Father's parental rights, the trial court found, by clear and convincing evidence, that the conditions which led to the removal of the children still persisted, and that "there [was] little likelihood that these conditions [would] be remedied at an early date so that the child[ren could] be safely returned to [Father] in the near future." This ground, commonly known as "persistence of conditions," is defined in Tennessee Code Annotated section 36-1-113(g)(3) as follows:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
>
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
>
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;

On appeal, Father acknowledges that the children had been removed from his custody since 2005. However, he argues that because he testified at trial that "he had a job and a home for about two months[,]" and DCS did not provide evidence to the contrary, that the trial court erred in finding that the conditions which led to the children's removal had not been remedied.

The purpose behind the "persistence of conditions" ground for terminating parental rights is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9 (Tenn. Ct. App. Mar. 3, 2008). That concern is well demonstrated in this case, as the children had been in DCS custody for three and a half years as of the date of trial. As we stated above, the record demonstrates that Father failed to maintain either stable income or employment. Although there were periods when Father possessed housing and employment, he was never able to sustain them long enough or to a level

necessary to effectuate a return of the children to his custody. The findings of the referee reveal that Father had stable housing but no income in October 2005. Although he had both housing and income in January of 2006, by November of 2007, Father, once again, lacked stable housing or employment. Additionally, DCS employee Ms. Jones testified that Father had gone from "job to job[,]" that he "had problems" financially supporting the children, and that Father was no "better off" at the time of trial than when the children were removed from his custody. Most importantly, Father, himself, testified that he was unable to support the children financially or to provide them with a stable residence. We agree with the trial court's finding that the conditions which led to the removal of the children still persisted, that there was little likelihood these conditions would be soon-remedied, and that a continuation of the parent/child relationship diminished the children's "chances of early integration into a safe, stable and permanent home[.]" **Tenn. Code Ann. § 36-1-113(g)(3)**.

### 4. *Reasonable Efforts*

Having found that the grounds of non-compliance with the permanency plans and failure to remedy persistent conditions have been proven by clear and convincing evidence, we must next determine whether DCS exerted "reasonable efforts" to assist Father with the permanency plans' requirements.

In cases involving the removal of a child from the parent's custody, the success of the parent's remedial efforts generally depends on DCS's assistance and support. *In re Giorgianna H.*, 205 S.W.3d 508, 518 (Tenn. Ct. App. 2006) (citing *In re C.M.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326, at *7 (Tenn. Ct. App. Mar. 9, 2004); *State Dep't of Children's Servs. v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *10 (Tenn. Ct. App. Aug. 13, 2003)). "Accordingly, in the absence of aggravating circumstances, the Department is statutorily required to make reasonable efforts to reunite a family after removing children from their parents' custody." *Id.* (citing Tenn. Code Ann. § 37-1-166(a)(2), (g)(2) (2005); *In re M.E.*, No. M2003-00859-COA-R3-PT, 2004 WL 1838179, at *9 (Tenn. Ct. App. Aug. 16, 2004); *In re C.M.M.*, 2004 WL 438326, at * 7). Specifically, DCS is required by statute to make "reasonable efforts" to make it "possible for the child to return safely to the child's home." Tenn. Code Ann. § 37-1-166(a)(2), (g)(2) (2005). Because of this obligation, DCS is typically required to demonstrate that it made reasonable efforts to reunite a child with his or her parents when termination proceedings are based on persistence of conditions or non-compliance with a permanency plan. *In re C.M.M. & S.D.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326, at *7 n.27 (Tenn. Ct. App. Mar. 9, 2004). DCS's efforts need not be "herculean," but it must do more than simply provide parents with a list of available services and send them on their way. *Id.* at 519 (citing *In re C.M.M.*, 2004 WL 438326, at *7). DCS's employees "must use their superior insight and training to assist the parents in addressing and completing the tasks identified in the permanency plan." *Id.* (citing *In re A.J.H.*, No. M2005-00174-COA-R3-PT, 2005 WL 3190324, at *9 (Tenn. Ct. App. Nov.28, 2005); *In re J.L.E.*, No. M2004-02133-COA-R3-PT, 2005 WL 1541862, at *14 (Tenn. Ct. App. June 30, 2005); *In re D.D.V.*, No. M2001-02282-COA-R3-JV, 2002 WL 225891, at *8 (Tenn. Ct. App. Feb.14, 2002)).

On the other hand, DCS "does not have the sole obligation to remedy the conditions that required the removal of the children from their parents' custody." *Id.* When reunification of the family is a goal, the parents share responsibility for addressing the conditions that led to removal. *Id.* Reunification is a "two-way street," and the law does not require DCS to carry the entire burden of this goal. *State Dep't of Children's Servs. v. S.M.D.*, 200 S.W.3d 184, 198 (Tenn. Ct. App. 2006). DCS cannot reasonably be expected to do everything for a parent. *In re T.M.D.Y.*, No. E2007-02357-COA-R3-PT, 2008 WL 933204, at *7 (Tenn. Ct. App. Apr. 7, 2008). If parents desire the return of their children, they must also make "reasonable and appropriate efforts to rehabilitate themselves and to remedy the conditions that required the Department to remove their children from their custody." *In re Giorgianna H.*, 205 S.W.3d at 519 (citing *State Dep't of Children's Servs. v. B.B.M.*, No. E2004-00491-COA-R3-PT, 2004 WL 2607769, at *7 (Tenn. Ct. App. Nov. 17, 2004); *In re C.M.M.*, 2004 WL 438326, at *7; *In re R.C.V.*, No. M2001-02102-COA-R3-JV, 2002 WL 31730899, at *12 (Tenn. Ct. App. Nov.18, 2002)).

"Reasonable efforts" by DCS means "the exercise of reasonable care and diligence . . . to provide services related to meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-166(g)(1) (2005). In making such reasonable efforts, "the child's health and safety shall be the paramount concern." *Id.* What is "reasonable" depends on the circumstances of each case, but the factors that courts use to determine the reasonableness of DCS's efforts include:

> (1) the reasons for separating the parent from his or her children, (2) the parent's physical and mental abilities, (3) the resources available to the parent, (4) the parent's efforts to remedy the conditions that required the removal of the children, (5) the resources available to the Department, (6) the duration and extent of the parent's remedial efforts, and (7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and the Department's efforts.

*In re Giorgianna H.*, 205 S.W.3d at 519 (citing *In re C.M.C.*, No. E2005-00328-COA-R3-PT, 2005 WL 1827855, at *9 (Tenn. Ct. App. Aug. 3, 2005); *State Dep't of Children's Servs. v. B.B.M.*, 2004 WL 2607769, at *6; *In re C.M.M.*, 2004 WL 438326, at *7).

The stated goal of the initial permanency plans in this case was reunification; thus, DCS was required to use reasonable efforts to make it possible for the children to return Father's custody. We must determine whether DCS presented "sufficient evidence regarding its reunification efforts to enable the trier-of-fact to conclude, without any serious or substantial doubt, that the Department's remedial efforts were reasonable under all the circumstances." *In the Matter of J.L.E.*, No. M2004-02133-COA-R3-PT, 2005 WL 1541862, at *12 (Tenn. Ct. App. June 30, 2005) (citing *In re C.M.M.*, 2004 WL 438326, at *8).

Despite the trial court's finding that DCS "provided Herculean efforts" to assist Father with completing the tasks of the permanency plans, Father maintains that DCS provided him with no assistance regarding finding and maintaining stable housing and employment. In fact, he testified at trial that the only assistance he received from DCS "[o]ut of five years" was four bus cards. From our review of the record, we find that the record does not support the trial court's finding that DCS made "Herculean efforts" or even reasonable efforts in assisting Father with finding and maintaining stable housing and income.

In its "Order Terminating Parental Rights and Final Decree of Partial Guardianship[,]" the trial court found

> Reasonable efforts to reunify the parents with said children were made by the Department in that the Department arranged visitations; assisted the parents in identifying support systems; provided bus passes for transportation; paid for utilities and groceries on occasion; and referred the family to Branches of Life; Parent Aid; the Exchange Club; University of Tennessee Boling; Health Connect; Innovative Counseling; Southeast Mental Health Center; Whitehaven Southwest Mental Health Center; Foundations Alcohol and Drug Treatment; South Memphis Alliance; Memphis Interfaith Association; Cathedral of Faith, and various other individuals and organizations for counseling and therapy.

After a thorough review of the record, we disagree that reasonable efforts were made regarding Father. The record reveals that Father received the following services: (1) four bus passes between 2006 and 2007; (2) twenty dollars towards groceries in May 2007; (3) assignment to a Parent Aide in April 2008; (4) parenting classes at the Exchange Club, completed in February 2006; (5) parenting classes at UT Boling; (6) a referral to South Memphis Alliance for Budget/Financial Literacy, Goal Setting/Decision Making and Parenting, which according to Ms. Jones, Father did not accept; (7) a mental health assessment by the LeBonheur Center for Children and Parents; (8) a list of housing sources; and (9) a meeting with a case manager to discuss a plan to furnish Father with furniture, bedding, clothing, and daycare.[10] The other services cited by the trial court appear to have been rendered to Mother only.

The numerous parenting plans entered into reference various actions needed to be taken by DCS in order to achieve the desired goals of the permanency plans. Such "[a]ctions [n]eeded" include: DCS will assist Father with his first month's rent and in furnishing a home; DCS will refer Father for in-home supports to assist with looking for housing; DCS will refer Father for Family Support services to assist him with obtaining employment; and DCS will assist with services to ensure Father receives skills needed to obtain and maintain employment." However, there is no

---

[10] Ms. Jones testified that referrals were made to Health Connect and Branches of Life. However, she did not specify for whom the services were referred, or what services were provided.

indication in the record, either from the affidavits of reasonable efforts, the testimony of Ms. Jones, or from the numerous exhibits, that DCS actually followed through with these plans and rendered such services to Father. Instead, the services rendered to Father primarily regard counseling and parenting skills, rather than Father's most critical issues of housing and employment. *See In re M.E.*, No. M2003-00859-COA-R3-PT, 2004 WL 1838179, at *10 (Tenn. Ct. App. Aug. 16, 2004) *perm. appeal denied* (Nov. 8, 2004) (finding that the failure to provide psychological counseling–the mother's primary need–mitigated the beneficial value of other services provided). Consistent with the factors enumerated in *In re Giorgianna H.*, we point out that the children came into DCS custody because of Father's lack of housing and income. Additionally, the trial court acknowledged that Father's securing housing and employment were the central requirements of the permanency plans.[11] Importantly, DCS has demonstrated that resources regarding housing and employment could have been provided to Father, as Mother received services from Health Connect regarding housing, and was advised by Ms. Jones "to go to the unemployment office and check the classifieds for employment, check all housing in Walls, Mississippi, contact vocational rehab for drive training, [and to] ask about Welfare to Work Program with DCS[.]" Because DCS failed to assist Father in securing and maintaining stable income and employment, we find that DCS did not exert reasonable efforts as required by Tennessee Code Annotated section 37-1-166. We acknowledge that Father did receive a list of housing sources; however, this action alone was insufficient to prove reasonable efforts on the part of DCS. *See generally, In re Q.D.B.*, No. W2008-01933-COA-R3-PT, 2009 WL 1362311, at *4 (Tenn. Ct. App. May 15, 2009) ("Reasonable efforts entail more than simply providing parents with a list of service providers and sending them on their way.").

### 5. *Grounds for Non-Legal Parents*

Because termination need only be proven on one ground, we must consider whether termination was appropriate under Tennessee Code Annotated section 36-1-113(g)(9). Tennessee Code Annotated section 36-1-113(g)(1)-(8) provides eight grounds for terminating the parental rights of legal parents. *See In re Adoption of S.M.F.*, No. M2004-00876-COA-R9-PT, 2004 WL 2804892, at *6 (Tenn. Ct. App. Dec. 6, 2004). However, the rights of any other person may be terminated pursuant to one or more of the grounds enumerated in section 36-1-113(g)(9). *Id.* "Whether a statutory ground for termination has been proved by the requisite standard is a question of law to be reviewed *de novo* with no presumption of correctness." *In re R.L.F.*, 278 S.W.3d 305, 312 (Tenn. Ct. App. 2008) (citing *In re B.T.*, No. M2007-01607-COA-R3-PT, 2008 WL 276012, at *2 (Tenn.

---

[11] In its "Order Terminating Parental Rights and Final Decree of Partial Guardianship" that trial court stated that Father "failed to complete the most important tasks" of the permanency plans. Orally, the trial court explained that "the most important things" were to "get a stable place to live and get a way to support these children."

Ct. App. Jan. 31, 2008)). In this case, DCS carries the burden of proving that there exists a statutory ground for termination.[12] **Tenn. Code Ann. § 36-1-113(c)(1)**.

In its "Order Terminating Parental Rights and Final Decree of Partial Guardianship[,]" the trial court found that Father's parental rights should be terminated pursuant to grounds (iv), (v), and (vi) of Tennessee Code Annotated section 36-1-113(g)(9)(A):

> The parental rights of any person who, at the time of the filing of a petition to terminate the parental rights of such person[,] . . . . is not the legal parent or guardian of such child . . . may be terminated based upon any one (1) or more of the following additional grounds:
>
> (iv) The person has failed to manifest an ability and willingness to assume legal and physical custody of the child;
> (v) Placing custody of the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child; or
>
> (vi) The person has failed to file a petition to establish paternity of the child within thirty (30) days after notice[13] of alleged paternity by the child's mother . . . [.]

Tennessee Code Annotated section 36-1-102 defines "legal parent" as follows:

> (A) The biological mother of a child;

---

[12] Tennessee Code Annotated section 36-1-113(g) states that the grounds for termination "are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground."

[13]
> For purposes of this subdivision (g)(9), "notice" means the mailing, postage pre-paid, or the sending by, express mail, courier, or other conveyance, to the person charged with notice at such person's address a statement that such person is believed to be the biological parent of a child. Notice shall be deemed received if the statement sent is not returned undelivered or evidence is not otherwise received by the sender that the statement was not delivered; and
>
> (ii) "Notice" also means the oral statement to an alleged biological father from a biological mother that the alleged biological father is believed to be the biological father of the biological mother's child[.]

**Tenn. Code Ann. § 36-1-113(9)(B)**. Father received notice of his paternity of J.L.T., J.R.T., and J.B.T. via the results of a DNA test in February of 2008.

(B) A man who is or has been married to the biological mother of the child if the child was born during the marriage or within three hundred (300) days after the marriage was terminated for any reason, or if the child was born after a decree of separation was entered by a court;

(C) A man who attempted to marry the biological mother of the child before the child's birth by a marriage apparently in compliance with the law, even if the marriage is declared invalid, if the child was born during the attempted marriage or within three hundred (300) days after the termination of the attempted marriage for any reason;

(D) A man who has been adjudicated to be the legal father of the child by any court or administrative body of this state or any other state or territory or foreign country or who has signed, pursuant to §§ 24-7-113, 68-3-203(g), 68-3-302 and 68-3-305(b), an unrevoked and sworn acknowledgment of paternity under the provisions of Tennessee law, or who has signed such a sworn acknowledgment pursuant to the law of any other state, territory, or foreign country; or

(E) An adoptive parent of a child or adult[.]

On appeal, Father does not argue that he is a "legal parent" within section 36-1-102's definition. Furthermore, the record includes no evidence that Father and Mother were ever married, that Father has been adjudicated the legal father of J.L.T., J.R.T., and J.B.T., or that Father signed a sworn acknowledgment of paternity. Accordingly, Father does not qualify as the "legal parent" of J.L.T., J.R.T., and J.B.T. under section 36-1-102; therefore, Tennessee Code Annotated section 36-1-113(g)(9)(A) is applicable in this case.

As we explained above, Father's ongoing instability in both his economic and housing status has indicated his inability to assume legal and physical custody of the children at this time. Further, his lack of progress towards the requirements of the numerous permanency plans poses a hindrance toward assuming such responsibilities. Thus, we find, pursuant to section 36-1-113(g)(9)(A)(iv), that Father "has failed to manifest an ability and willingness to assume legal and physical custody" of his children.

Additionally, we agree that awarding custody to Father would pose a risk of substantial harm to the children's physical or psychological welfare. Because Father testified that he was unable to support the children financially or to provide them with a stable residence, returning the children to his custody would pose a substantial threat to their physical welfare. Likewise, Ms. Jones testified at trial that four of the five children had been living with their foster mother, who was considering adopting those four children, for "over two years" and had "developed a strong attachment to her[,]" and she agreed that awarding custody to Father would cause harm to the children.

Regarding ground (vi), Father concedes that he did not legitimate his children. However, he blames his failure to do so on DCS, claiming that after "[h]e took the DNA test for the children . . . when he tried to come back to court they told him he needed papers for DHS." Father states "There is no evidence that [DCS] made a follow up court date to assist in legitimating the children." He also claims that "he should have been seen as the 'legal father[,]'" despite his failure to legitimate the children, because "he provided the children with money and uniforms[,]" because he was ordered by the court to pay child support for the children,[14] because he visited the children on a regular basis, and because "he held all the children out to be his even after the DNA test proved two of the children were not."

We reject Father's argument that his efforts to visit with or provide for the children remedied his failure to establish paternity. However, we agree with Father that DCS has not shown that it aided Father in establishing paternity as required by the permanency plans. In a recent decision, this Court found that "DCS has some responsibility to the biological father in establishing paternity pursuant to Tenn. Code Ann. § 36-1-113(g)(9)(A)(vi)." *State, Dep't of Children's Servs. v. Williams*, No. W2008-02001-COA-R3-PT, 2009 WL 2226116, at *8 (Tenn. Ct. App. July 28, 2009) (citing *In re S.T.T.*, No. M2007-01609-COA-R3-PT, 2008 WL 162538 (Tenn. Ct. App. Jan. 17, 2008)). In *Williams*, this Court found that the father "consented to a DNA test, had the test performed, and notified the court in writing that he wished to pursue his rights as the biological father of the child[,]" but that "not enough was done on DCS' part to aid [the father,]" as the father testified that DCS never indicated that they would help him in establishing paternity. *Id.*

From the record in this case, it is unclear whether Father or DCS initiated the genetic testing. However, it is clear that Father consented to the testing, and that he attempted to establish paternity by visiting the court to determine the requirements for doing so. Accordingly, we find under the unique facts of this case, that the record does not support the trial court's finding that Father failed to establish paternity pursuant to Tennessee Code Annotated section 36-1-113(g)(9)(A)(vi).

Father's parental rights were terminated pursuant to section 36-1-113(g)(9)(A)(iv) and (v) because he failed to obtain and maintain stable employment and housing. As we stated above, DCS failed to exert reasonable efforts to assist Father with obtaining and maintaining stable employment and housing, such that termination was not appropriate under 36-1-113(g)(2) or (3). Not only did DCS' assistance regarding employment and housing fail to meet the "reasonable efforts" standard required under (g)(2) and (3), but it also failed to meet the less-stringent requirements for the termination of non-legal parents' rights. We find that Father's parental rights cannot be terminated

---

[14] Father makes no citation to the record to support his allegation that he was ordered by a court to pay child support. Furthermore, from our review of the record, we find no indication that Father was actually paying any child support. When asked how he supported his children, Father stated "If they ask me for something, I just take it to them."

pursuant to section 36-1-113(g)(9)(a)(iv) or (v) as these grounds implicate DCS's obligation to assist Father, and such assistance has not been shown.[15]

Because we find that DCS failed to assist Father with obtaining and maintaining stable housing and employment, or to aid Father in establishing himself as the legal father of J.L.T., J.R.T., and J.B.T., we find that the trial court erred in terminating Father's parental rights. Having so found, all remaining issues are pretermitted.

## V. CONCLUSION

For the aforementioned reasons, the decision of the trial court is reversed, the petition for termination is dismissed, and the cause is remanded for further proceedings consistent with this opinion. Costs of this appeal are taxed to Appellee State of Tennessee Department of Children's Services, for which execution may issue, if necessary. ____

ALAN E. HIGHERS, P.J.,W.S.____

---

[15] We note that termination proceedings based on the grounds in Tennessee Code Annotated section 36-1-113(g)(4)-(8) usually *do not* require DCS to demonstrate that it has made reasonable efforts to reunite a child with his or her parents, while termination proceedings based on grounds (1)-(3) usually *do* require DCS to demonstrate that it has made such reasonable efforts. *In re C.M.M. & S.D.M.*, 2004 WL 438326, at *7 n.26-27.